

**SIGNED THIS 27th day of July, 2020**

THIS MEMORANDUM OPINION HAS BEEN ENTERED
ON THE DOCKET. PLEASE SEE DOCKET FOR
ENTRY DATE.

Paul M. Black
UNITED STATES BANKRUPTCY JUDGE

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |  | |
|---|---|---|---|
| IN RE: | ) | | |
| | ) | **CHAPTER 13** | |
| **PHYLLIS ADELE JOHNSON** | ) | | |
| | ) | | |
| Debtor. | ) | **CASE NO. 18-71446** | |

## MEMORANDUM OPINION

This matter comes before the Court on an objection to Proof of Claim Number 8 of James D. Carter ("Carter") filed on March 1, 2019 by the Debtor, Phyllis Adele Johnson (the "Debtor"). Discovery was lengthy and, prior to a trial set for October 2019, the parties requested the matter be referred to mediation. The Court granted that request, but the mediation was unsuccessful. A new trial date was set for June 18, 2020. At trial, Carter and the Debtor each testified and numerous exhibits were admitted into evidence. At the conclusion of the hearing, the Court took the matter under advisement. For the reasons that follow, the objection to claim will be sustained in part and overruled in part.

## FINDINGS OF FACT

This case involves two people from disparate professional backgrounds who got into the real estate investment business together. Carter is a veterinarian and the Debtor was once a patron of his clinic, as Carter treated animals she owned. In the course of that relationship, Carter learned that the Debtor supposedly had real estate investment experience, including knowledge of using historic rehabilitation tax credits, and Carter advised her that he had cash he would like to invest in a real estate venture. The Debtor advised she could put his cash to work.[1] As the record established at trial, Carter's communications with the Debtor over the course of their dealings together were erratic and infrequent. For a number of years, Carter was, at best, an absentee inquisitor as to most of the Debtor's dealings in their relationship. That relationship soured over time, primarily because bills were not being paid on time and Carter was having to pump additional cash into the venture. The Debtor eventually ran into her own financial difficulties, and to no surprise, so did the real estate venture with Carter.

As a result of her financial difficulties, the Debtor filed a voluntary petition for relief under Chapter 13 of the United States Bankruptcy Code on October 24, 2018. Her Chapter 13 plan has not been confirmed. As Carter is her dominant creditor, until her relationship and debts to Carter can be determined, it will be difficult, if not impossible, for the Debtor to propose a confirmable plan.

On December 27, 2018, Carter filed Proof of Claim Number 8 for funds used or owed in the joint real estate venture. On March 1, 2019, the Debtor filed an objection to the Claim disputing that the Debtor is liable to Carter for all of the amounts listed on the Claim and

---

[1] When the Court uses the word "cash," it does so for a reason. Most of Carter's substantial contributions to this real estate venture were in cash, not by check, wire transfer or other means. This created some concern on the Court's part as to, among other things, the lack of a paper trail for Carter's investments.

asserting that the Debtor is entitled to multiple credits against any balance determined to be owed to Carter. On March 19, 2020, Carter filed Amended Proof of Claim Number 8 (the "Claim") asserting that he is entitled to a general unsecured claim in the Debtor's case for $380,141.53. The amount consists of: (1) $108,000.00 for payments due under a partnership agreement; (2) $15,373.14 for repayment of real estate taxes; (3) $24,239.97 for reimbursement of current delinquent real estate taxes as listed on the Debtor's schedules; (4) $55,702.00 in unpaid rents from rental properties; (5) $99,344.66 for sums due secured by a credit line deed of trust to the Bank of Botetourt; (6) $2,743.91 for late fees and penalties on debts to the bank; (7) $41,891.85 in attorney's fees; (8) $15,600.00 in unaccounted for checks drawn from the renovation account; and (9) $17,246.00 in rental commissions taken by the Debtor without the agreement of Carter. The Debtor argues that the Claim does not reflect that the partnership's assets, consisting of rental real estate on Woods Avenue (the "Woods Property") and on Allison Avenue (the "Allison Property") in Roanoke, Virginia, are available to be liquidated to repay a portion of the funds.

The Claim arises out of a largely undocumented joint venture between the Debtor and Carter. The arrangement was that Carter would provide most of the funds to purchase and renovate properties and the Debtor would provide her experience to rehabilitate and maintain the properties. The Debtor and Carter agreed that they would search for properties that would qualify for participation in the historic tax credit program. The only written agreement between the parties is a document signed by the Debtor and Carter on January 10, 2003, entitled "Partnership Agreement" which reflects a "capital contribution" made by Carter "for the purpose of renovation of properties owned by the partnership." Carter's Ex. 2. The Partnership Agreement further states that Carter's capital contributions would be repaid "[u]pon sale of the

3

property located at 421-423 Woods Ave., S.W., Roanoke, Va. and belonging to Johnson-Carter Investments."[2]

On July 25, 1995, the Debtor and Carter purchased the Woods Property and took title in their individual names as tenants in common.  Debtor's Ex. B.  On May 31, 1996, the Debtor and Carter purchased the Allison Property and again took title in their individual names as tenants in common.  Debtor's Ex. C.  On November 8, 1996, the Debtor and Carter executed a $100,000.00 credit line deed of trust with the Bank of Botetourt to fund renovations and maintenance of the properties.  Carter's Ex. 4.  Through October 1997, the Debtor and Carter borrowed $80,027.00 on the line of credit.  Debtor's Ex. M, 2.  On October 9, 1997, the parties paid the line of credit down to zero.  Debtor's Ex. M, 3.

On December 5, 1997, the Debtor submitted an application for the historic tax credit for the Woods Property.  The Commonwealth of Virginia Department of Historic Resources certified the Woods Property as eligible for the historic tax credit on April 30, 1998.  Debtor's Ex. N.  On July 15, 1999, the Debtor submitted an application for the historic tax credit for the Allison Property.  The Commonwealth of Virginia Department of Historic Resources certified the Allison Property as eligible for the historic rehabilitation tax credit on April 11, 2000.  Debtor's Ex. O.

The parties originally intended to renovate the two properties, qualify for the historic tax credits, and then sell the properties.  However, upon finishing the renovation of each property, the properties were rented instead of sold.  Since the properties were rented, the Debtor managed the properties including getting tenants and collecting rent.  Carter appeared to agree with this.

---

[2] There is no such entity formally organized as "Johnson-Carter Investments."

4

On August 24, 2014, Carter discovered that the City of Roanoke real estate taxes for the Allison and Woods Properties were unpaid. Carter paid $15,373.14 to the City of Roanoke from his personal funds to clear up the tax debt. Carter's Ex. 6, 1. As discussed below, there are numerous other components of the Claim that Carter asserts are directly caused by the Debtor's actions or inactions, which give rise to the sums claimed in the case, including the Debtor taking substantial real estate management commissions to which Carter never agreed. The Debtor asserts that many of the sums claimed are not due Carter, or that she is entitled to credits against the Claim asserted. It is undisputed that both the Woods and Allison Properties are currently listed for sale with a realtor. Whether they will bring enough to pay the secured liens against the properties, and the debts due Carter, remains to be seen.

## JURISDICTION

This Court has jurisdiction of this matter by virtue of the provisions of 28 U.S.C. §§ 1334(a) and 157(a) and the referral made to this Court by Order from the District Court on December 6, 1994 and Rule 3 of the Local Rules of the United States District Court for the Western District of Virginia. This Court further concludes that this matter is a "core" bankruptcy proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (B).[3]

## CONCLUSIONS OF LAW

I.  The Applicable Law

A.  Burden of Proof

Section 502 of the Bankruptcy Code governs the allowance of claims to be paid from the bankruptcy estate. *See In re Harford Sands Inc.,* 372 F.3d 637, 640 (4th Cir. 2004) ("The

---

[3] A reasonable argument could be made that the Court should abstain and let an appropriate state court sort this out. However, the parties have been before this Court for an extended period and have tried but failed to settle it, even with the assistance of a gifted mediator. Everyone has had their day in court and, in the best exercise of judicial resources and the resources of the parties, it is time for this matter to be resolved.

Bankruptcy Code establishes a burden-shifting framework for proving the amount and validity of a claim."). When a claimant files a proof of claim with the required supporting documentation, it is *prima facie* evidence of the claim's validity and the amount owed by the debtor. *In re Falwell*, 434 B.R. 779, 783 (Bankr. W.D. Va. 2009). "The burden then shifts to the debtor to object to the claim" and to "introduce evidence to rebut the claim's presumptive validity." *Harford Sands*, 372 F.3d at 640. The evidence "must be sufficient to demonstrate the existence of a true dispute and must have probative force equal to the contents of the claim." *Falwell*, 434 B.R. at 784. "If the debtor offers such evidence, the burden shifts back to the creditor to produce evidence meeting the objections and establishing the claim." *Id.* "If the claimant cannot produce sufficient evidence, the claim fails, and the court should sustain the objection." *In re Hilton*, No. 12-61102, 2013 WL 6229100, at *5 (Bankr. W.D. Va. Dec. 2, 2013).

    B.    <u>Organizational Structure</u>

The parties in this case are two people who never should have gotten into business with each other, certainly without documenting their rights and responsibilities with one another. Nevertheless, they did go into business together, and the Court is left to sort out the shambles of their failed relationship. There is no question the law of Virginia applies to this relationship.

In *PGI, Inc. v. Rathe Productions, Inc.,* 265 Va. 334, 342, 576 S.E.2d 438 (2003), the Virginia Supreme Court stated as follows:

> In *Legum Furniture Corp. v. Levine,* 217 Va. 782, 787, 232 S.E.2d 782, 786 (1977), we cited 46 Am.Jur.2d *Joint Ventures* §§ 36, 37 with approval as follows:
>
> The rights, duties, and obligations of joint venturers and of members of syndicates, as between themselves, depend primarily upon the terms of the contract by which they assumed that relationship. They are also affected, however, by certain general principles which operate in the absence of specific provisions in the contract, or sometimes in conjunction with such provisions. These principles . . .

> . are much the same as, or at least are clearly analogous to, those which govern the relations of partners.
>
> In *Roark,* 234 Va. at 475, 362 S.E.2d at 714, we restated the principle at stake with greater emphasis: "the rules of law governing the rights, duties, and liabilities of joint venturers are substantially the same as those which govern partnerships."

In this case, there is no express contract between the Debtor and Carter which established their relationship as a joint venture.[4] However, the evidence adduced at trial establishes an implied contract for a joint venture and, to the extent this implied contract does not address an issue, the law of partnership is applied. In Virginia, "[t]he Virginia Uniform Partnership Act (the 'Act'), Code §§ 50-73.79 to -73.149, 'governs relations among the partners and between the partners and the partnership' except as provided in a partnership agreement and to the extent that the agreement does not violate certain specific statutory requirements." Va. Code § 50-73.81. "If the issue in question is not addressed by the partnership agreement or the Act, 'the principles of law and equity' apply." *PGI, Inc.*, 265 Va. at 342 (citing Va. Code § 50-73.82).

At common law, ordinarily one partner was not permitted to sue another partner before settlement of all partnership business occurred. *See, e.g., Dulles Corner Props. II Ltd. P'ship v. Smith,* 246 Va. 153, 155, 431 S.E.2d 309, 311 (1993). The Act specifically addresses exceptions to this common law rule. Va. Code § 50-73.103. Among other provisions, Section 50-73.103(B)(2)(a) provides that "A partner may maintain an action against the partnership <u>or another partner</u> for legal or equitable relief, with or without an accounting as to partnership business, to: [e]nforce that partner's rights under this chapter, including . . . [t]hat partner's rights under § 50-73.99. . . ." (emphasis added). In turn, Section 50-73.99 of the Act provides, in part,

---

[4] The "Partnership Agreement" signed January 10, 2003 is a one page "fill in the blank" document that basically acknowledges a $113,000.00 capital contribution, a $5,000.00 credit, and when the capital contribution is due to be reimbursed. It does nothing more. It is far from a formal partnership or joint venture agreement.

7

that (i) each partner is deemed to have an account that is: "[c]redited with an amount equal to the money plus the value of any other property, net of the amount of any liabilities, the partner contributes to the partnership and the partner's share of the partnership profits", (ii) a partnership shall reimburse a partner for an advance to the partnership based on the amount of capital the partner agreed to contribute, (iii) a partner may use or possess partnership property only on behalf of the partnership, and (iv) a partner is not entitled to compensation for services performed for the partnership, except for reasonable services rendered in winding up the business of the partnership.  The Act further provides in Section 50-73.99(D) that "[a] partnership shall reimburse a partner for an advance to the partnership beyond the amount of capital the partner agreed to contribute."  Subsection (E) provides that "[a] payment or advance made by a partner which gives rise to a partnership obligation under subsections C or D constitute a loan to the partnership which accrues interest from the date of the payment or advance."  Va. Code § 50-73.99(D), (E).  Subsection (F) provides that each partner has equal rights in the management of the partnership business.  Va. Code § 50-73.99(F).

It is with these principles in mind that the Court addresses the various allegations among the parties.

II.    Application of Law to Facts

(1) Payment due under the Partnership Agreement

Carter's counsel conceded at trial the net $108,000.00 payment under the Partnership Agreement was only to be recouped by Carter upon the sale of the Woods Property.  He further conceded that he was no longer making a claim for that amount in the Proof of Claim.  The Claim will be reduced in that amount.

8

(2) Repayment of Real Estate Taxes

Next, Carter requests $15,373.14 in delinquent real estate taxes due on the Allison and Woods Properties which were paid by Carter personally. Attached to the Amended Proof of Claim is the City of Roanoke Treasurer's Office Real Estate Tax Payment History for the Allison Property showing payment of taxes for tax years 2011, 2012, 2013, 2014, and 2015.

Applying the burden-shifting framework, Carter's Amended Proof of Claim and the attached payment history constitute *prima facie* evidence of the claim. The burden of proof then shifts to the Debtor to introduce evidence to rebut the claim's presumptive validity. The Debtor testified that she does not contest that Carter personally expended the $15,373.14 for real estate taxes; however, she contends that the funds were an additional investment into the partnership and not a loan that the Debtor agreed to personally repay to Carter. At trial, Carter's counsel conceded that the $15,373.14 in real estate taxes will be reimbursed to Carter from the sale of the properties. Indeed, this is consistent with Va. Code § 50-73.99(C).[5] Thus, the $15,373.14 in real estate taxes paid by Carter will be paid to Carter out of the proceeds from the sale of the properties and the settlement of the partnership accounting, and the Claim will be reduced in that amount.

(3) Reimbursement of Delinquent Real Estate Taxes

Next, Carter seeks reimbursement in the amount of $24,239.97 for current delinquent real estate tax amounts owed for the two properties. These taxes are not yet paid. Attached to the Amended Proof of Claim are City of Roanoke Real Estate Tax Statements for tax year 2020 on

---

[5] Va. Code § 50-73.99(C) provides that "[a] partnership shall reimburse a partner for payments made and indemnify a partner for <u>liabilities incurred by the partner in the ordinary course of the business of the partnership or for the preservation of its business or property</u>; however, no person shall be required as a consequence of the indemnification to make any payment to the extent that the payment would be inconsistent with subsections B and C of § 50-73.96." (emphasis added).

the two properties. The Debtor testified that she does not contest that real estate taxes are owed on the properties; however, she testified that the debt is not hers personally but a debt of the partnership. At trial, the Debtor's counsel agreed that the real estate taxes will be paid out of the proceeds when the properties are sold. Thus, the Claim will be reduced by that amount.

(4) Unpaid Rent

Carter seeks to recover $55,702.00 in unpaid rent from the two properties. Attached to the Amended Proof of Claim is an exhibit showing how Carter calculated the amount of rent owed. Applying the burden-shifting framework, Carter's Amended Proof of Claim and the attached calculation of rent constitute *prima facie* evidence of the claim. The burden of proof then shifts to the Debtor to introduce evidence to rebut the claim's presumptive validity. The Debtor denies that she kept any funds collected as rent from the properties for her personal use and that all rent collected was used to pay the partnership's debts or for maintenance of the properties. The Debtor further testified that Carter accepted the partnership's practice of the Debtor handling the rental receipts for more than twenty years without requesting an accounting. The evidence produced by the Debtor is sufficient to establish that there is a true dispute regarding unpaid rents. Thus, the burden shifts back to Carter to prove the amount and validity of the claim by a preponderance of the evidence. The Court does not believe that Carter has carried this burden.

Carter testified regarding how he came up with the rents received. *See* Carter's Ex. 8. He testified that he took the rents received amount from the tax returns and subtracted the expenses listed on the tax returns to determine the amount of profit. He further testified that depreciation was not part of the calculation. He testified that there are no existing tax returns for

1996, 1997, 2018, and 2019, so he determined the amounts for these years by averaging rent and expenses from prior years.

The Court is not persuaded by Carter's methodology that the numbers are credible. Further, Carter could have asked the Debtor years ago why he was not receiving rent checks or checks in a higher amount, but failed to do so. He turned a blind eye to the Debtor's handling of their arrangement for not months – but years. Carter has not carried his burden of proving by a preponderance of evidence the validity and amount of the unpaid rent part of his claim and this part of the Claim will be disallowed.

(5) Sums due Under the Credit Line Deed of Trust

Carter seeks to recover $99,344.66 on the Bank of Botetourt credit line deed of trust. Attached to the Amended Proof of Claim is a Loan Payment Notice showing this amount due. Carter's position is that the sums due under the credit line were used by the Debtor in her personal name and not as partnership expenses. Applying the burden-shifting framework, Carter's Amended Proof of Claim, the attached Loan Payment Notice, and description of why the Debtor owes the money constitute *prima facie* evidence of the claim. The burden of proof then shifts to the Debtor to introduce evidence to rebut the claim's presumptive validity. The Debtor denies that the funds were used for personal expenses and states that all funds were used for maintenance and other costs associated with the properties. The evidence produced by the Debtor is sufficient to establish that there is a true dispute regarding whether the sums due under the Bank of Botetourt credit line deed of trust were used for the Debtor's personal expenses or solely for partnership expenses. Thus, the burden shifts back to Carter to prove the amount and validity of the claim by a preponderance of the evidence. The Court does not believe that Carter has carried this burden.

At trial, Carter testified that he received an email from the Debtor responding to questions regarding distribution of funds upon the sale of properties.  One of the questions posed by Carter in the email was "And that you will pay off the Line of Credit Loan from the Bank of Botetourt with your own funds?"  The response was "Yes, we've discussed this before."  These emails were admitted into evidence as Carter's Exhibit 12.  Later, the Debtor testified that she did not send that email and that the email Carter sent the questions to (sterest@rbinternet.net) was an old, non-working email for her.

In rebuttal, Carter sought to introduce a letter signed by "Dawn L. Jones For Phyllis Johnson."  Carter's Ex. 18.  The letter written by Dawn Jones stated, among other things, "Phyllis will be busy with an out of town couple showing property for the next few days, but has asked me to send you a note telling you that you can e-mail her at sterest@rbinternet.net. . . ."  The Debtor objected to the letter's admission by asserting that it is inadmissible hearsay.  The Court took the objection under advisement.

Under the Federal Rules of Evidence, hearsay is an out-of-court statement offered to prove the truth of the matter asserted in the statement.  Fed. R. Evid. 801(c). "The purpose of the hearsay rule is to remove from evidence out-of-court statements offered for their truth that have questionable trustworthiness when the opposing party has no opportunity to contest the hearsay's reliability."  *In re Davis*, 607 B.R. 522, 527 (Bankr. D.S.C. 2019) (citations omitted).  The Court finds that the letter is inadmissible hearsay because it is being offered by Carter to show that the email address in question is in fact the Debtor's email.  Thus, the Court sustains the Debtor's objection on the basis that the letter is inadmissible hearsay without exception.

While the Court finds it more than curious that the email and letter were sent purportedly on the Debtor's behalf, there was no third-party testimony to shore up or corroborate the

testimony on this matter. Dawn Jones was not a witness, and her testimony would have been most helpful.[6] The Court concludes that Carter did not prove the validity and amount of this aspect of the claim by a preponderance of the evidence. Other than Carter's Exhibit 12, which the Court does not find persuasive, there is no credible admitted evidence that shows that the Debtor agreed to pay the credit line deed of trust personally. Thus, Carter has not carried his burden. The debt secured by the credit line deed of trust will have to be paid upon sale of the properties and the settlement of the partnership accounting, and it will be excluded from the Claim in this case.

### (6) Late Fees and Penalties under the Deed of Trust

Carter seeks to recover $2,743.91 in late fees and penalties on the Bank of Botetourt deed of trust and credit line deed of trust, as well as NBC Bank late fees. Attached to the Proof of Claim is an exhibit showing a breakdown of the late fees and penalties requested. Applying the burden-shifting framework, Carter's Amended Proof of Claim and the attached breakdown of fees constitute *prima facie* evidence of the claim. The burden of proof then shifts to the Debtor to introduce evidence to rebut the claim's presumptive validity. The Debtor denies that there is any basis for a claim that she personally owes Carter late fees and penalties. The Debtor further asserts that the fees and penalties were partnership fees on partnership debt. The evidence asserted by the Debtor is sufficient to establish that there is a true dispute regarding fees and penalties. Thus, the burden shifts back to Carter to prove the amount and validity of the claim by a preponderance of the evidence. The Court does not believe that Carter has carried this burden.

---

[6] Dawn Jones was purportedly an employee of an attorney doing work for the Debtor. Both the letter and the email have a fishy smell. While the Court has some concerns about the Debtor's testimony on this point, it is not enough to persuade the Court these documents were actually sent by the Debtor such that they can bind her.

Carter testified that based on the rents paid there should have been sufficient money to pay the monthly payments when due without incurring any penalties or late fees. The Debtor was the partner responsible for collecting rent and made payments on the loans; however, Carter could have inquired, intervened, and put a stop to this issue long ago. Carter has not carried his burden to prove that he is entitled to a claim for late fees and penalties and this part of the Claim will be disallowed.

(7) Attorney's Fees

Carter seeks recovery of attorney's fees of $41,891.85 plus additional fees that continue to accrue, representing his legal fees incurred in pursuing his general unsecured claim and defending the Debtor's objection to his claim. Attached to the Amended Proof of Claim is a document showing a breakdown of attorney's fees including the hours worked and hourly rate. Applying the burden-shifting framework, Carter's Amended Proof of Claim and the attached breakdown of attorney's fees constitute *prima facie* evidence of the claim. The burden of proof then shifts to the Debtor to introduce evidence to rebut the claim's presumptive validity. The Debtor denies that any agreement exists that she agreed to pay Carter's legal fees if he pursued a claim against her personally. She further denies that any form of partnership agreement exists under which either partner would be entitled to reimbursement of legal fees from the partnership. The evidence asserted by the Debtor is sufficient to establish that there is a true dispute regarding reimbursement of attorney's fees. Thus, the burden shifts back to Carter to prove the amount and validity of the claim by a preponderance of the evidence. The Court does not believe that Carter has carried this burden.

Ordinarily, each party bears their own costs of litigation and the prevailing party may only seek recovery of attorney's fees if otherwise permitted by contract or independent statute.

*DIRECTV, LLC v. Coley (In re Coley),* Nos. 18-02154-5-JNC, 2020 WL 265931, at *5 (Bankr. E.D.N.C. Jan. 16, 2020) (citations omitted).  As stated by the United States Supreme Court, "[o]ur basic point of reference when considering the award of attorney's fees is the bedrock principle known as the American Rule: Each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 126, 135 S. Ct. 2158, 2164 (2015) (internal citations omitted).

Carter cites to *Prospect Development Co., Inc. v. Bershader*, 258 Va. 75, 515 S.E.2d 191 (1999), in support of the assertion that the Debtor should pay Carter's attorney's fees.  In *Bershader*, the Supreme Court of Virginia ruled that a chancellor in equity may, in his discretion, award attorney's fees to a prevailing party in a fraud suit. *Id.* at 92.  The Court finds that *Bershader* is inapplicable to the present case because there is no allegation of fraud in this case, and Carter has provided no other persuasive authority that the Debtor's actions as a miscreant partner give right to a reimbursement of attorney's fees.  Indeed, consistent with federal law guidance, "[t]he general rule in this Commonwealth is that in the absence of a statute or contract to the contrary, a court may not award attorney's fees to the prevailing party." *Id.* (citing *Gilmore v. Basic Indus., Inc.,* 233 Va. 485, 490, 357 S.E.2d 514, 517 (1987)).  Thus, because Carter points to no contract, independent statute, or exception to the general rule that would entitle Carter to attorney's fees, the objection to this aspect of the Claim will be sustained.

(8) Checks Drawn from the Renovation Account

Carter seeks to recover $15,600.00 for unaccounted for checks drawn by the Debtor from a bank account designated for renovation expenses.  Attached to the Claim are two checks, for $15,000.00 and $600.00 respectively, signed by the Debtor.  Also attached to the Claim are the financial statements showing the withdrawals from the partnership bank account.

Applying the burden-shifting framework, Carter's Amended Proof of Claim and the attached document showing the checks and financial statements constitute *prima facie* evidence of the claim. The burden of proof then shifts to the Debtor to introduce evidence to rebut the claim's presumptive validity. The Debtor denies that the funds were used for her personal benefit and states that they were used to pay for renovation costs associated with the two properties. The evidence asserted by the Debtor is sufficient to establish that there is a true dispute regarding the withdrawals. Thus, the burden shifts back to Carter to prove the amount and validity of the claim by a preponderance of the evidence. The Court believes that Carter has carried this burden.

At trial, Carter testified that the Debtor wrote a check to NBC Bank for $15,000.00. He stated that at the time the check was written the partnership was not paying NBC Bank and thus the money was basically a cash withdrawal. The Debtor presented conflicting testimony at trial. First, the Debtor testified that the $15,000.00 check was a transfer from the operating account to the money market account. Later, the Debtor testified that the check was used to pay off the mortgage on the Woods Property because it had to be paid by a cashier's check. The Court finds the Debtor's descriptions unpersuasive to show how this money was spent.

Carter further testified that $600.00 was withdrawn from the partnership money market account at NBC Bank with no explanation as to how it was used. The relevant Financial Services Statement shows a $600.00 withdrawal. The Debtor testified she believed she had to pay somebody for work done renovating the properties. The Court finds that the Debtor's description is inadequate to show how this money was spent.

The Court finds Carter has met his burden in proving the amount and validity of this portion of the claim by a preponderance of the evidence. Thus, Carter has a claim under Section 50-73.103 against the Debtor and this portion of the claim, $15,600.00, will be allowed.

(9) Management Fees Taken by the Debtor

Carter seeks to recover $17,246.00 constituting management fees that the Debtor paid herself from 2005 to 2012 for management of the partnership's rental properties without agreement. Attached to the Claim is a document showing the fees taken which are based on Schedule E of the applicable tax returns.

Carter testified that his arrangement with the Debtor was that Carter would supply capital to buy properties and the Debtor would oversee locating, renovating, and renting the properties. Carter further testified that the Debtor took management fees from 2005 to 2012 with no agreement that she would take a commission or management fees from the rental of the properties. Pursuant to Carter's Amended Proof of Claim and Schedule E of the tax returns, the Debtor took $17,246.00 in management fees from 2005 to 2012. The Court finds that Carter carried his burden of proving by a preponderance of the evidence the validity and amount of the management fees part of his claim. The Debtor started taking management fees in 2005 without agreement from Carter. This also violates Section 50-73.99(H).[7] The Debtor was supposed to manage the properties as part of her partnership duties, while Carter was to supply most of the capital. Thus, the Court finds that Carter may enforce his rights as a partner under Section 50-73.103 against the Debtor to recover these sums, and this portion of the claim will be allowed in the amount of $17,246.00.

---

[7] "A partner is not entitled to remuneration for services performed for the partnership, except for reasonable compensation for services rendered in winding up the business of the partnership." Va. Code § 50-73.99(H).

**CONCLUSION**

For the foregoing reasons, the Court will sustain in part and overrule in part the Debtor's Objection to the Claim of James D. Carter. The Claim will be allowed in the amount of $32,846.00, which includes the $17,246.00 in management fees taken by Debtor without agreement or permission and the $15,600.00 in unaccounted for checks and withdrawals. The capital contribution of $108,000.00, the $15,373.14 repayment of real estate taxes, the $24,239.97 in current delinquent real estate taxes, and the $99,344.66 debt secured by the credit line deed of trust are matters that should be paid when the properties are sold and the final partnership/joint venture accounting is settled. The unpaid rent, attorney's fees and late fees sought are not otherwise recoverable.

A separate Order will be entered contemporaneously herewith.